**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| MOBILE TELECOMMUNICATIONS TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>TIME WARNER CABLE INC., TIME WARNER CABLE ENTERPRISES LLC, and TIME WARNER CABLE TEXAS LLC,<br><br>Defendants. | Civil Action File No. 2:16-cv-0007-JRG-RSP<br><br>**JURY TRIAL REQUESTED** |

**DEFENDANTS TIME WARNER CABLE INC., TIME WARNER CABLE ENTERPRISES LLC AND TIME WARNER CABLE TEXAS LLC'S ANSWER TO PLAINTIFF MOBILE TELECOMMUNICATIONS TECHNOLOGIES, LLC'S COMPLAINT FOR PATENT INFRINGEMENT**

Defendants Time Warner Cable Inc. ("TWCI"), Time Warner Cable Enterprises LLC ("TWCE"), and Time Warner Cable Texas LLC ("TWCT") (collectively, "TWC") hereby answer Plaintiff Mobile Telecommunications Technologies, LLC's ("MTel") Complaint (the "Complaint") for infringement of U.S. Patent Nos. 5,590,403 (the "'403 Patent"), 5,659,891 (the "'891 Patent"), and 5,915,210 (the "'210 Patent") (collectively, the "Asserted Patents" or the "Patents-in-Suit") as follows.

**PARTIES**

1. TWC lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 1 of the Complaint and therefore denies them.

2. TWC lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 2 of the Complaint and therefore denies them.

3. TWC lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 3 of the Complaint and therefore denies them.

4. TWC admits the allegations set forth in Paragraph 4 of the Complaint.

5. TWC admits the allegations set forth in Paragraph 5 of the Complaint.

6. TWC denies the allegations set forth in Paragraph 6 of the Complaint.

7. TWC admits the allegations set forth in Paragraph 7 of the Complaint.

8. TWC admits the allegations set forth in Paragraph 8 of the Complaint.

9. TWC denies the allegations set forth in Paragraph 9 of the Complaint.

10. TWC admits that a "Time Warner Cable" branded store is located at 1460 Calder Avenue, Beaumont, Texas. TWC denies the remaining allegations set forth in Paragraph 10 of the Complaint.

11. TWC admits that it offered certain wireless equipment and services for use in customer premises and/or at Wi-Fi hotspots during a portion of the Relevant Period. TWC denies the remaining allegations set forth in Paragraph 11 of the Complaint.

12. TWC admits that it provided certain customers with Wi-Fi Enabled CPE that may be capable of operating in accordance with one or more of the IEEE 802.11 a, g, n, or ac amendments. TWC denies the remaining allegations set forth in Paragraph 12 of the Complaint.

13. TWC admits the allegations set forth in Paragraph 13 of the Complaint.

14. TWC admits that it provided certain equipment to end-users and customers for lease for a monthly fee, including customers in this District. TWC denies the remaining allegations set forth in Paragraph 14 of the Complaint.

15. TWC admits that it provided customer support 24 hours a day, 7 days a week to customers that have leased modems from TWC and that technicians, who provide customer service on its behalf may have assisted certain customers with setting up their service. TWC denies the remaining allegations set forth in Paragraph 15 of the Complaint.

16. TWC admits that it provided on its website a list of compatible modems and that some of those modems may be capable of operating in accordance with one or more of the IEEE 802.11 a, g, n, or ac amendments. TWC denies the remaining allegations set forth in Paragraph 16 of the Complaint.

17. TWC denies the allegations set forth in Paragraph 17 of the Complaint.

18. TWC admits that it may have assisted in the download of software to certain customer premises equipment. TWC denies the remaining allegations set forth in Paragraph 18 of the Complaint.

19. TWC admits that it offered Wi-Fi Enabled CPE and high speed data service to its customers. TWC denies the remaining allegations set forth in Paragraph 19 of the Complaint.

20. TWC admits that it offered a service called "Home WiFi." TWC denies the remaining allegations set forth in Paragraph 20 of the Complaint.

21. TWC admits that it offered home security and automation services under the brand name IntelligentHome and that such services require that customers have a high speed data connection. TWC denies the remaining allegation set forth in Paragraph 21 of the Complaint.

22. TWC also admits that wireless service customers were able to connect for free to Wi-Fi hotspots in the United States, including ones in this District, and that certain of those hotspots were operated by TWC. TWC denies the remaining allegations set forth in Paragraph 22 of the Complaint.

23. TWC admits that it used Wi-Fi Enabled Access Points, which may be capable of operating in accordance with one or more of the IEEE 802.11 a, g, n, or ac amendments, in connection with its public Wi-Fi services. TWC denies the remaining allegations set forth in Paragraph 23 of the Complaint.

24. TWC admits it was a party to agreements with Bright House Networks, Comcast, and Cox Communications which allow each other's high-speed data customers to access Wi-Fi networks with the "CableWiFi" wireless network name. TWC denies the remaining allegations set forth in Paragraph 24 of the Complaint.

25. TWC admits it used Wi-Fi Enabled Access Points, which may be capable of operating in accordance with one or more of the IEEE 802.11 a, g, n, or ac amendments, in connection with its public Wi-Fi services, such as those offered through networks identified by the name TWCWiFi, CableWiFi, and TWCWiFi-Passpoint.

26. TWC admits that Wi-Fi Enabled Access Points provided customers, including some customers in this District, with wireless access to the Internet during a portion of the Relevant Period. TWC lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 26 of the Complaint and therefore denies them.

27. TWC admits that it offered a streaming TV service known as TWC TV and that Wi-Fi Enabled CPE or Wi-Fi Enabled Access Points may be used by customers in connection with the use of that service. TWC denies the remaining allegations set forth in Paragraph 27 of the Complaint.

28. TWC denies the allegations set forth in Paragraph 28 of the Complaint.

29. TWC denies the allegations set forth in Paragraph 29 of the Complaint.

30. TWC denies the allegations set forth in Paragraph 30 of the Complaint.

31. TWC denies the allegations set forth in Paragraph 31 of the Complaint.

32. TWC admits that it offers certain wireless equipment and services to end-users and customers in the United States, including in this District. TWC denies the remaining allegations set forth in Paragraph 32 of the Complaint.

**JURISDICTION AND VENUE**

33. TWC admits that the Complaint purports to state claims arising under the patent laws of the United States of America, 35 U.S.C. § 1 *et seq*., but denies that there is any legal or factual basis for any such claims. TWC admits that this Court has subject matter jurisdiction over the purported subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). TWC admits that venue exists in this District for the claims against TWC pursuant to 28 U.S.C. §§ 1391 and 1400(b). However, TWC denies that this Court is the most convenient venue for litigation of the claims in the Complaint, and TWC reserves the right to assert that a change of venue under 28 U.S.C. §1404 is appropriate.

34. TWC admits that this Court has personal jurisdiction over TWC.

35. No response is required to MTel's reference to the "paragraphs above," *i.e.*, Paragraphs 1-34 of the Complaint. To the extent a response is deemed required, TWC repeats and incorporates by reference, as if fully set forth herein, its answers to Paragraphs 1-34, as set forth above. TWC admits that this Court has personal jurisdiction over TWC. TWC denies that its wireless equipment and services infringe or have infringed the Patents-in-Suit in this or any other judicial district, directly or indirectly, literally or under the doctrine of equivalents. TWC denies the remaining allegations set forth in Paragraph 35 of the Complaint.

## FIRST CLAIM FOR RELIEF

(Infringement of Claims 1, 10, 11 of United States Patent No. 5,590,403)

36. No response is required to MTel's reference and incorporation of Paragraphs 1-35 of the Complaint. To the extent a response is deemed required, TWC repeats and incorporates by reference, as if fully set forth herein, its answers to Paragraphs 1-35, as set forth above.

37. TWC admits that the face of the '403 Patent bears the title "Method and System for Efficiently Providing Two Way Communication Between a Central Network and Mobile Unit," and that it purports to have been issued by the United States Patent and Trademark Office ("USPTO") on December 31, 1996. TWC admits that what purports to be a copy of the '403 Patent is attached to the Complaint as Exhibit A. TWC denies that the '403 Patent was duly and legally issued. TWC denies that any claim of the '403 Patent is valid and enforceable or that any claim enjoys a statutory presumption of validity. TWC is without knowledge or information sufficient to form a belief as to the remaining allegations set forth in Paragraph 37 of the Complaint and therefore denies those allegations.

38. TWC denies the allegations set forth in Paragraph 38 of the Complaint.

39. TWC denies the allegations set forth in Paragraph 39 of the Complaint.

40. TWC admits that it offered certain wireless equipment to customers that may be capable of operating in accordance with one or more of the IEEE 802.11 n or ac amendments. MTel's allegations in Paragraph 40 of the Complaint concerning the alleged "variations" and "configurations" of MIMO that TWC implemented are not sufficiently specific such that TWC can understand the exact nature of MTel's allegations. Specifically, MTel does not identify any specific MIMO "variation" or "configuration" so that TWC can appropriately respond to the allegations in Paragraph 40. Accordingly, TWC is without knowledge or information sufficient

to form a belief as to the remaining allegations in Paragraph 40 of the Complaint and therefore denies them.

41. TWC admits that it offered certain wireless equipment to customers that may be capable of operating in accordance with one or more of the IEEE 802.11 n or ac amendments and thus may use MIMO. MTel's allegations in Paragraph 41 of the Complaint concerning the alleged "main relevant techniques" of MIMO that TWC used are not sufficiently specific such that TWC can understand the exact nature of MTel's allegations. Paragraph 41 of the Complaint does not define the "main relevant techniques," such as by way of reference to specific aspects of the 802.11n and/or 802.11ac standards. Accordingly, TWC is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 41 of the Complaint and therefore denies them.

42. TWC denies the allegations set forth in Paragraph 42 of the Complaint.

43. TWC denies the allegations set forth in Paragraph 43 of the Complaint.

44. TWC denies the allegations set forth in Paragraph 44 of the Complaint.

45. TWC denies the allegations set forth in Paragraph 45 of the Complaint.

46. TWC denies the allegations set forth in Paragraph 46 of the Complaint.

47. TWC denies the allegations set forth in Paragraph 47 of the Complaint.

48. TWC denies the allegations set forth in Paragraph 48 of the Complaint.

49. TWC denies the allegations set forth in Paragraph 49 of the Complaint.

50. TWC denies the allegations set forth in Paragraph 50 of the Complaint.

51. TWC denies the allegations set forth in Paragraph 51 of the Complaint.

**SECOND CLAIM FOR RELIEF**
(Infringement of Claims 1, 2, 3, 4 and 5 of United States Patent No. 5,659,891)

52. No response is required to MTel's reference and incorporation of Paragraphs 1-51 of the Complaint. To the extent a response is deemed required, TWC repeats and incorporates by reference, as if fully set forth herein, its answers to Paragraphs 1-51, as set forth above.

53. TWC admits that the face of the '891 Patent bears the title "Multicarrier Techniques in Bandlimited Channels," and that it purports to have been issued by the USPTO on August 19, 1997. TWC admits that what purports to be a copy of the '891 Patent is attached to the Complaint as Exhibit B. TWC denies that the '891 Patent was duly and legally issued. TWC denies that any claim of the '891 Patent is valid and enforceable or that any claim enjoys a statutory presumption of validity. TWC is without knowledge or information sufficient to form a belief as to the remaining allegations set forth in Paragraph 53 of the Complaint and therefore denies those allegations.

54. TWC denies the allegations set forth in Paragraph 54 of the Complaint.

55. TWC denies the allegations set forth in Paragraph 55 of the Complaint.

56. Paragraph 56 of the Complaint does not contain allegations directed at TWC to which a response is required.

57. Paragraph 57 of the Complaint contains an alleged explanation of subcarrier spacing in 802.11 systems which is not an allegation directed at TWC to which a response is required. To the extent that this is deemed to be an allegation against TWC, TWC denies the allegations set forth in Paragraph 57 of the Complaint.

58. TWC denies the allegations set forth in Paragraph 58 of the Complaint.

59. TWC denies the allegations set forth in Paragraph 59 of the Complaint.

60. TWC denies the allegations set forth in Paragraph 60 of the Complaint.

61. TWC denies the allegations set forth in Paragraph 61 of the Complaint.

62. TWC denies the allegations set forth in Paragraph 62 of the Complaint.

63. TWC denies the allegations set forth in Paragraph 63 of the Complaint.

64. TWC denies the allegations set forth in Paragraph 64 of the Complaint.

65. TWC denies the allegations set forth in Paragraph 65 of the Complaint.

## THIRD CLAIM FOR RELIEF

(Infringement of Claims 1, 7, 8, 10, 15, 16, 17 and 19 of United States Patent No. 5,915,210)

66. No response is required to MTel's reference and incorporation of Paragraphs 1-65 of the Complaint. To the extent a response is deemed required, TWC repeats and incorporates by reference, as if fully set forth herein, its answers to Paragraphs 1-65, as set forth above.

67. TWC admits that the face of the '210 Patent bears the title "Method and System for Providing Multicarrier Simulcast Transmission," and that it purports to have been issued by the USPTO on June 22, 1999. TWC admits that what purports to be a copy of the '210 Patent is attached to the Complaint as Exhibit C. TWC denies that the '210 Patent was duly and legally issued. TWC denies that any claim of the '210 Patent is valid and enforceable or that any claim enjoys a statutory presumption of validity. TWC is without knowledge or information sufficient to form a belief as to the remaining allegations set forth in Paragraph 67 of the Complaint and therefore denies those allegations.

68. TWC denies the allegations set forth in Paragraph 68 of the Complaint.

69. TWC denies the allegations set forth in Paragraph 69 of the Complaint.

70. TWC denies the allegations set forth in Paragraph 70 of the Complaint.

71. TWC denies the allegations set forth in Paragraph 71 of the Complaint.

72. TWC denies the allegations set forth in Paragraph 72 of the Complaint.

73. TWC denies the allegations set forth in Paragraph 73 of the Complaint.

74. TWC denies the allegations set forth in Paragraph 74 of the Complaint.

75. TWC denies the allegations set forth in Paragraph 75 of the Complaint.

76. TWC denies the allegations set forth in Paragraph 76 of the Complaint.

77. TWC denies the allegations set forth in Paragraph 77 of the Complaint.

## PRAYER FOR RELIEF

MTel's prayer for relief does not require a response from TWC. Nevertheless, TWC denies that MTel is entitled to any of the relief requested in the Complaint, or to any other form of relief, from any action taken by or on behalf of TWC.

## DEMAND FOR JURY TRIAL

TWC admits that the Complaint sets forth a demand for a trial by jury. TWC, likewise, demands a trial by jury on all issues so triable.

## AFFIRMATIVE DEFENSES

### First Defense
### (Invalidity)

1. All of the claims of the Patents-in-Suit are invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, including without limitation §§ 101, 102, 103, 112, and/or 116. For example, and without way of limitation, the claims of the Patents-in-Suit are invalid for the following reasons: (i) the asserted claims of the '403 Patent are invalid as being anticipated and/or obvious under 35 U.S.C. §§ 102 and 103 in view of U.S. Patent No. 4,968,966 to Jasinski; U.S. Patent No. 5,423,056 to Linquist; U.S. Patent No. 5,109,390 to Gilhousen; and U.S. Patent No. 5,195,090 to Bolliger; (ii) the asserted claims of the '210 Patent are invalid as being anticipated and/or obvious under 35 U.S.C. §§ 102 and 103 in view of Le Floch, et al., "Digital Sound Broadcasting to Mobile Receivers," IEEE Transactions on Consumer Electronics, Vol. 35, Issue 3, Aug 1989,

pp. 493-503; Saalfrank, DE4102408; Nakamura et al., "256 QAM Modem for Multicarrier 400 Mbit/s Digital Radio," IEEE Journal on Selected Areas in Communications, Vol. SAC-5, No. 3, Apr. 1987, pp. 329-335; and Bingham, "Multicarrier Modulation for Data Transmission: An Idea Whose Time Has Come," IEEE Communications Magazine, May 1990, pp. 5-14; (iii) the asserted claims of the '891 Patent are invalid as being anticipated and/or obvious under 35 U.S.C. §§ 102 and 103 in view of the paper "Permutation Modulation for Advanced Radio Paging" presented at IEEE Southeastcon '93 on or about April 4, 1993; the paper entitled "Multicarrier Permutation Modulation for Narrowband PCS," published in 1994 in Springer Publishing's book "Wireless Personal Communications: Trends and Challenges"; the paper published in November 1994 in "IEEE Transactions on Vehicular Technology" entitled "Multicarrier Modulation for Narrowband PCS"; the document entitled "Technical Feasibility Demonstration" filed with the Federal Communications Commission; Mobile Telecommunication Technologies Corp.'s Petition for Rulemaking to Allocate 150 kHz in the 930-931 MHz Band and to Establish Rules and Policies for a New Nationwide Wireless Network (NWN) Service; the '403 Patent; and Cimini, L.J., "Analysis and Simulation of a Digital Mobile Channel Using Orthogonal Frequency Division Multiplexing," IEEE Transactions on Communications, Vol. 33, Issue 7, Jul. 1985, pp. 665-675; (iv) the asserted claims 10 and 11 of the '403 Patent and all asserted claims of the '210 Patent are indefinite in their use of the term-of-degree "substantially," without providing any guidance to one of ordinary skill in the art for determining the objective boundaries delineated by the use of that term-of-degree; (v) all asserted claims of the '891 Patent are indefinite for use of the term "band edge of the mask" because the claims, through the use of this term, when read in light of the specification and the prosecution history, do not provide any objective boundaries for those of ordinary skill in the art

under the Supreme Court's *Nautilus* precedent; (vi) the asserted claims of the '210 and '891 Patents are invalid under 35 U.S.C. § 116 for omitting inventor Petrovic as described below in TWC's Seventh and Tenth Defense; and (vii) the asserted claims of the '891 Patent are invalid under 35 U.S.C. § 101 for being directed to non-patentable subject matter, for example an unpatentable formula. As further evidence of the invalidity of the '210 and '891 Patents, the Patent Trial and Appeal Board has recently instituted *inter partes* reexaminations on the '210 Patent in IPR2015-01724 and *inter partes* reexaminations on the '891 Patent in IPR2015-01726.

**Second Defense**
**(Equitable Defenses)**

2. MTel's claims for relief are barred, in whole or in part, by the principles of equity, including without limitation, acquiescence, laches, estoppel, waiver, misconduct, patent misuse, unfair competition, unclean hands, and/or other equitable defenses.

**Third Defense**
**(Limitation on Damages and Costs)**

3. Any claim by MTel for damages or recovery of costs is limited by the Patent Act, including without limitation, 35 U.S.C. §§ 286, 287, and/or 288.

**Fourth Defense**
**(Disclaimer/Prosecution History Estoppel)**

4. MTel is estopped from construing any valid claim of the Patents-in-Suit to cover or include, either literally or by application of the doctrine of equivalents, any product made, used, imported, sold, or offered for sale by TWC because of the admissions and/or statements made to the USPTO in the specifications of, and during the prosecution of, the applications leading to the issuance of the Patents-in-Suit.

**<u>Fifth Defense</u>**
**(License and/or Exhaustion)**

5. MTel's claims for patent infringement are precluded in whole or in part (i) to the extent that any allegedly infringing products or components thereof are supplied, directly or indirectly, to TWC by any entity or entities having express or implied licenses to the Patents-in-Suit and/or (ii) under the doctrine of patent exhaustion.

**<u>Sixth Defense</u>**
**(Inequitable Conduct for Failure to Disclose Known Prior Art While Procuring the '891 Patent with Intent to Deceive)**

6. Each and every claim of the '891 Patent is unenforceable because one or more of the named inventors and/or their patent counsel failed to disclose prior art highly material to patentability of that patent with the intent to deceive the USPTO.

7. On June 7, 1995, William D. Hays, Dennis W. Cameron, and Walter Roehr (the "Applicants") filed a patent application with the United States Patent and Trademark Office ("USPTO") through their attorneys and which the USPTO assigned U.S. Patent Application No. 08/480,718 ("the '718 Application").

8. On August 19, 1997, the USPTO issued the '891 Patent as a result of the '718 Application.

9. The '891 Patent lists William D. Hays, Dennis W. Cameron, and Walter Roehr as co-inventors.

10. Upon information and belief, independent Claims 1, 3, and 5 of the '891 Patent disclose methods of multicarrier transmission in a bandlimited channel and teach that the center frequencies of each carrier should be chosen such that the frequency difference between the center frequencies of the outer most carriers and the frequencies of the channel's edges are at least half the difference between the center frequencies of each carrier.

11. Upon information and belief, Mr. Roehr, at the time employed by Telecommunication Networks Consulting and Mr. Cameron, at the time employed by MTEL Technologies Corp., the predecessor in interest to Plaintiff and Counter-Defendant MTel, collaborated with Dr. Rade Petrovic of the University of Mississippi to present a paper entitled "Permutation Modulation for Advanced Radio Paging" ("Petrovic 1") at IEEE Southeastcon '93 on or about April 4, 1993.

12. Upon information and belief, Mr. Roehr and Mr. Cameron, both named inventors on the '891 Patent, substantially contributed to the contents of Petrovic 1, and were involved in the presentation of Petrovic 1.

13. Petrovic 1 disclosed the use of a multicarrier permutation modulation technique that allocated eight (8) subcarriers with a five kilohertz (5 kHz) separation between each subcarrier within a fifty kilohertz (50 kHz) channel.

14. The subcarriers referred to in Petrovic 1 are the same carriers claimed to be taught by independent claims 1, 3, and 5 of the '891 Patent.

15. Petrovic 1 disclosed the modulation of groups of six (6) data bits onto the eight (8) allocated subcarriers, with each combination of six (6) data bits modulated onto different combinations of four (4) subcarriers out of the eight (8) possible subcarriers.

16. Petrovic 1 disclosed that a 7.5 kHz guard band should be used between the center frequencies of the outermost subcarriers and the frequencies of the edges of the channel.

17. Petrovic 1 disclosed "a 35 kHz pass band in the middle of the channel and 7.5 kHz guard bands on each side for the skirts of the spectrum" and "eight subcarriers spaced 5 kHz apart, so that there is exactly 35 kHz spacing between end subcarriers."

18. Petrovic 1 was published in 1993, over a year prior to the ’891 Patent’s earliest priority date, and therefore qualifies as prior art to the ’891 Patent under 35 U.S.C. §§ 102(a) and (b).

19. Upon information and belief, applicants Mr. Roehr, at the time employed with Telecommunication Networks Consulting, and Mr. Cameron, at the time employed with MTEL Technologies Corp., together with Dr. Petrovic, collaborated on a paper entitled “Multicarrier Permutation Modulation for Narrowband PCS,” published in 1994 in Springer Publishing’s book “Wireless Personal Communications: Trends and Challenges” (“Petrovic 2”).

20. Upon information and belief, both Mr. Roehr and Mr. Cameron, named inventors on the ’891 Patent, substantially contributed to the contents of Petrovic 2.

21. Petrovic 2 disclosed the use of eight (8) subcarriers with a five kilohertz (5 kHz) separation between the center frequency of each subcarrier within a fifty kilohertz (50 kHz) channel.

22. The subcarriers referred to in Petrovic 2 are the same carriers claimed to be taught by independent claims 1, 3, and 5 of the ’891 Patent.

23. Petrovic 2 disclosed the modulation of groups of six (6) data bits onto the eight (8) allocated subcarriers, with each combination of six (6) data bits modulated onto different combinations of four subcarriers out of the eight (8) possible subcarriers.

24. Petrovic 2 disclosed the use of a five kilohertz (5 kHz) guard band between the center frequencies of each of the outermost subcarriers and the frequencies of the edges of the channel.

25. Petrovic 2 was published in 1994, prior to the ’891 Patent’s earliest priority date, and therefore qualifies as prior art to the ’891 Patent under 35 U.S.C. § 102(a).

26. Upon information and belief, Mr. Roehr, at the time employed by Telecommunication Networks Consulting, and Mr. Cameron, at the time employed with MTEL Technologies Corp., together with Dr. Petrovic, collaborated on a paper published in November 1994 in "IEEE Transactions on Vehicular Technology" entitled "Multicarrier Modulation for Narrowband PCS" ("Petrovic 3"). Upon information and belief, IEEE received the manuscript from the authors on November 10, 1992. Upon information and belief, the authors revised the manuscript on April 22, 1993 and again on January 5, 1994.

27. Upon information and belief, Mr. Roehr and Mr. Cameron, both named inventors on the '891 Patent, were substantially involved in the preparation of the initial manuscript and the subsequent revisions that led to the publication of Petrovic 3.

28. Petrovic 3 disclosed a type of multicarrier modulation in which a transmitter first divides data into several interleaved bit streams and then uses each of these separate bit streams to modulate several carriers.

29. The several carriers referred to in Petrovic 3 are the same carriers claimed to be taught by independent claims 1, 3, and 5 of the '891 Patent.

30. Petrovic 3 disclosed that, in theory, the proposed mask in the fifty kilohertz (50 kHz) narrowband PCS channel could support up to eleven (11) carriers with a three kilohertz (3 kHz) separation between the center frequencies of each carrier.

31. Petrovic 3 disclosed that the outermost two (2) of the eleven (11) potential carriers should remain unused to simplify the design of the transmitter and receiver.

32. Petrovic 3 was published in 1994, prior to the '891 Patent's earliest priority date, and therefore qualifies as prior art to the '891 Patent under 35 U.S.C. § 102(a).

33. Mr. Cameron, Mr. Roehr, and Mr. Hays are named as co-inventors on U.S. Patent No. 5,590,403 (“the ’403 Patent”).

34. The ’403 Patent was filed on November 12, 1992 and issued on December 31, 1996.

35. Upon information and belief, Mr. Cameron, Mr. Roehr, and Mr. Hays knew of the filing of the patent application that issued as the ’403 Patent on or before its filing on November 12, 1992.

36. The ’403 Patent disclosed an “exemplary embodiment” where “the carrier frequencies are spaced 3 kHz apart within a desired frequency band of 50 kHz” and guard bands of 11.5 kHz each.

37. The application leading to the ’403 Patent was filed before the ’891 Patent’s earliest priority date, and thus qualifies as prior art to the ’891 Patent under 35 U.S.C. § 102(e).

38. On or about June 1, 1992, Mr. Jai P. Bhagat, at the time Executive Vice President of Mobile Telecommunication Technologies Corp. and President of MTel Technologies Corp., filed a document entitled “Technical Feasibility Demonstration” with the Federal Communications Commission (“the FCC Document”).

39. Exhibit A to the FCC Document was entitled “Transmitter Parameter Characterization for NWN” and listed D.W. Cameron as the “Client Contact.” Upon information and belief, the D.W. Cameron listed on Exhibit A to the FCC Document is the same David Cameron named as a co-inventor on the ’891 Patent.

40. Exhibit A to the FCC Document disclosed “5 modulated carriers (3 kbps BPSK) can be placed in a 50 kHz bandwidth” and “approximately half of the authorized bandwidth to be occupied with modulated signal (e.g. 22.5 kHz out of 50 kHz was modelled).”

41. Figure 2 of Exhibit A to the FCC Document disclosed placing 8 modulated carriers in a 50 kHz bandwidth with sub-carrier separation of 4.5 kHz and having the difference between the center frequencies of the outermost subcarriers and the frequencies of the edges of the bandlimited channel be approximately 10.75 kHz.

42. The FCC Document at footnote 3 references Mobile Telecommunication Technologies Corp.'s Petition for Rulemaking to Allocate 150 kHz in the 930-931 MHz Band and to Establish Rules and Policies for a New Nationwide Wireless Network (NWN) Service ("the Petition for Rulemaking Document"). The Petition for Rulemaking Document was filed on or about November 12, 1991. A FCC public notice document, dated on or about April 30, 1992, stated that the Petition for Rulemaking Document was "released for public comment today" and was made "available for inspection in the ET Docket No. 92-100 file at the FCC public reference room (Room 239), 1919 M Street N.W. Washington, DC 20554."

43. The Petition for Rulemaking Document disclosed a single "emissions mask," bandlimited channel of 50 kHz and the simultaneous transmission of several carriers from the same location (e.g. utilizing 4 or 8 tone multitone orthogonal M-ary FSK (MOOK) modulation techniques to simultaneously transmit).

44. Figure 1 of the Petition for Rulemaking Document disclosed frequency differences of 3 kHz and 6 kHz (the 6 kHz frequency difference only occurs between the adjacent carriers to the "pilot tone") between the center frequency of adjacent carriers or "tone pairs" and 10 kHz guardbands of the total 50 kHz bandlimited channel. The guardband of 10 kHz is more than 3 kHz (which is one half of the greatest frequency difference between adjacent carriers).

45. Upon information and belief, Mr. Cameron, a named inventor on the ’891 Patent, had knowledge of the contents of Exhibit A to the FCC Document and the Petition for Rulemaking Document prior to August 19, 1997.

46. Upon information and belief, Mr. Cameron, a named inventor on the ’891 Patent, had knowledge of the existence of the FCC Document and the Petition for Rulemaking Document prior to August 19, 1997.

47. The FCC Document and the Petition for Rulemaking Document were made public more than one year before the ’891 Patent’s earliest priority date, and thus qualify as prior art to the ’891 Patent under 35 U.S.C. §§ 102(a) and 102(b).

48. Upon information and belief, Mr. Roehr and Mr. Cameron, as co-authors of Petrovic 1, Petrovic 2, and Petrovic 3, had knowledge of the contents and technical details of the multicarrier transmission methods disclosed in each of these papers, and had this knowledge before they filed the ’718 Application through their attorneys.

49. Upon information and belief, Mr. Cameron, Mr. Roehr, and Mr. Hays, as named co-inventors of the ’403 Patent, had knowledge of the contents and technical details described therein, and had this knowledge before they filed the ’718 Application through their attorneys.

50. Upon information and belief, Mr. Cameron, as the named “Client Contact” on Exhibit A to the FCC Document, had knowledge of the content and technical details described in Exhibit A to the FCC Document and the Petition for Rulemaking Document referenced in the FCC Document, and had this knowledge before he filed the ’718 Application through his attorneys.

51. Upon information and belief, Mr. Cameron had knowledge, prior to the issuance of the ’891 Patent, that the FCC Document and the Petition for Rulemaking Document had been

publicly filed with the FCC on or about June 1, 1992, and on or about November 12, 1991, respectively.

52. On or about September 18, 1995, Mr. Cameron executed a Declaration and Power of Attorney in connection with the ’718 Application that included a signed declaration in which he acknowledged the duty to disclose information that was material to patentability as defined in 37 C.F.R. § 1.56 at all times while the ’718 Application was pending. It further included a signed declaration in which Mr. Cameron acknowledged that he had reviewed and understood the contents of the ’718 Application’s specification, including the claims in the ’718 Application.

53. On or about September 11, 1995, Mr. Roehr executed a Declaration and Power of Attorney in connection with the ’718 Application that included a signed declaration in which he acknowledged the duty to disclose information that was material to patentability as defined in 37 C.F.R. § 1.56 at all times while the ’718 Application was pending. It further included a signed declaration in which Mr. Roehr acknowledged that he had reviewed and understood the contents of the ’718 Application’s specification, including the claims in the ’718 Application.

54. On or about September 20, 1995, Mr. Hays executed a Declaration and Power of Attorney in connection with the ’718 Application that included a signed declaration in which he acknowledged the duty to disclose information that was material to patentability as defined in 37 C.F.R. § 1.56 at all times while the ’718 Application was pending. It further included a signed declaration in which Mr. Hays acknowledged that he had reviewed and understood the contents of the ’718 Application’s specification, including the claims in the ’718 Application.

55. Upon information and belief, Mr. Roehr, Mr. Cameron, and Mr. Hays continued to be aware of the status and content of the claims pending in the ’718 Application during the prosecution of the ’718 Application.

56. Upon information and belief, given their participation as authors in each of Petrovic 1, Petrovic 2, and Petrovic 3, both Mr. Roehr and Mr. Cameron knew that each of these papers were material to the claims prosecuted in the ’718 Application and knew of their individual duties to disclose material prior art to the USPTO for consideration in evaluating the patentability of those claims.

57. Upon information and belief, given their participation as named co-inventors of the ’403 Patent, Mr. Cameron, Mr. Roehr, and Mr. Hays knew that the ’403 Patent was material to the claims prosecuted in the ’718 Application and knew of their individual duties to disclose material prior art to the USPTO for consideration in evaluating the patentability of those claims.

58. Upon information and belief, given Mr. Cameron’s participation in and knowledge of the FCC Document and the Petition for Rulemaking Document, Mr. Cameron knew that the FCC Document and the Petition for Rulemaking Document were material to the claims prosecuted in the ’718 Application and knew of his individual duty to disclose material prior art to the USPTO for consideration in evaluating the patentability of those claims.

59. On August 9, 1995, Applicants, through their attorney, submitted to the USPTO an Information Disclosure Statement (“IDS”) for the ’718 Application, which did not identify any of the Petrovic 1, Petrovic 2, Petrovic 3, FCC Document, or Petition for Rulemaking Document references.

60. On October 3, 1995, Applicants, through their attorney, submitted to the USPTO an additional IDS for the ’718 Application, which did not identify any of the Petrovic 1, Petrovic 2, Petrovic 3, FCC Document, or Petition for Rulemaking Document references.

61. Throughout the prosecution of the ’718 Application that matured into the ’891 Patent, the Applicants never disclosed any of the Petrovic 1, Petrovic 2, Petrovic 3, FCC Document, or Petition for Rulemaking Document references to the USPTO.

62. Throughout the prosecution of the ’718 Application that matured into the ’891 Patent, the Applicants never disclosed the ’403 Patent to the USPTO.

63. The Petrovic 1, Petrovic 2, Petrovic 3, FCC Document, and Petition for Rulemaking Document references were not considered by the USPTO during prosecution of the ’891 Patent.

64. The ’403 Patent was not considered by the USPTO during prosecution of the ’891 Patent.

65. In the August 9, 1996 Office Action from Examiner Nguyen during prosecution of the ’718 Application, the Examiner stated “[a]s to claims 1, 3 and 9, the frequency difference between the center frequency of the outer most carriers and the band edge of the mask is greater than half the frequency difference between the center frequencies of each adjacent carrier, is not taught or suggested in the prior art of record.” Claim 9 of the ’718 Application was renumbered to claim 5 of the ’891 Patent as issued. Petrovic 1, Petrovic 2, Petrovic 3, the ’403 Patent, the FCC Document, and the Petition for Rulemaking Document each disclose this element of independent claims 1, 3, and 5 of the ’891 Patent.

66. The teachings of Petrovic 1, Petrovic 2, Petrovic 3, the ’403 Patent, the FCC Document, and the Petition for Rulemaking Document each disclosed multicarrier modulation techniques in bandlimited channels where the difference between the center frequencies of the outermost subcarriers and the frequencies of the edges of the bandlimited channel is at least half the difference between the center frequencies of each subcarrier.

67. The teachings of Petrovic 1, Petrovic 2, Petrovic 3, the ’403 Patent, the FCC Document and the Petition for Rulemaking Document are highly material to the independent claims of the ’891 Patent.

68. Petrovic 1 undermines the alleged distinctions of independent claims 1, 3, and 5 of the ’891 Patent over the prior art of record in the prosecution of the ’891 Patent. Petrovic 1 disclosed a multicarrier permutation modulation method where the frequency difference between the center frequency of the outermost subcarriers and the frequencies of the edges of the 50 kHz channel is at least 7.5 kHz, and thus more than half the 5 kHz frequency difference between the center frequencies of each subcarrier. The Patent Trial and Appeal Board has three times instituted *inter parties* reexaminations based on Petrovic 1, *i.e.*, in IPR2014-01035, IPR2015-00018 and most recently IPR2015-01726.

69. Petrovic 2 undermines the alleged distinctions of independent claims 1, 3, and 5 of the ’891 Patent over the prior art of record in the prosecution of the ’891 Patent. Petrovic 2 disclosed a multicarrier permutation modulation method where the frequency difference between the center frequencies of the outermost subcarriers and the frequencies of the band edges of the 50 kHz channel is at least 5 kHz, and thus more half the 5 kHz frequency difference between the center frequencies of each subcarrier.

70. Petrovic 3 undermines the alleged distinctions of independent claims 1, 3, and 5 of the ’891 Patent over the prior art of record in the prosecution of the ’891 Patent. Petrovic 3 disclosed the elimination of the two outermost potential carriers, which resulted in a frequency difference between the center frequencies of the remaining outermost carriers and the frequencies of the band edges of the channel (at least 3 kHz, the width of the eliminated

subcarriers), which is more than half the difference between the center frequencies of each remaining subcarrier (3 kHz).

71. The ’403 Patent undermines the alleged distinctions of independent claims 1, 3, and 5 of the ’891 Patent over the prior art of record in the prosecution of the ’891 Patent. The ’403 Patent disclosed a frequency difference between the center frequencies of the outermost carriers and the frequencies of the band edges of the channel of at least 11.5 kHz, which is more than half the difference between the center frequencies of each remaining subcarrier, specifically 1.5 kHz, as disclosed in the ’403 Patent.

72. The FCC Document undermines the alleged distinctions of independent claims 1, 3, and 5 of the ’891 Patent over the prior art of record in the prosecution of the ’891 Patent. The FCC Document disclosed a frequency difference between the center frequencies of the outermost carriers and the frequencies of the band edges of the channel of at least 10.75 kHz, which is more than half the difference between the center frequencies of each remaining subcarrier, specifically 2.25 kHz, as disclosed in the FCC Document.

73. The Petition for Rulemaking Document undermines the alleged distinctions of independent claims 1, 3, and 5 of the ’891 Patent over the prior art of record in the prosecution of the ’891 Patent. The Petition for Rulemaking Document disclosed a single “emissions mask,” bandlimited channel of 50 kHz and the simultaneous transmission of several carriers from the same location (e.g., utilizing 4 or 8 tone multitone orthogonal M-ary FSK (MOOK) modulation techniques to simultaneously transmit). The Petition for Rulemaking Document further disclosed frequency differences of 3 kHz and 6 kHz (the 6 kHz frequency difference only occurs between the adjacent carriers to the “pilot tone”) between the center frequency of adjacent carriers or “tone pairs” and 10 kHz guardbands of the total 50 kHz bandlimited channel. The

guardband of 10 kHz is more than 3 kHz (which is one half of the greatest frequency difference between adjacent carriers).

74. Upon information and belief, a reasonable examiner would have considered Petrovic 1, Petrovic 2, Petrovic 3, the ’403 Patent, the FCC Document, and/or the Petition for Rulemaking Document highly material to the patentability of the ’718 Application, because if Petrovic 1, Petrovic 2, Petrovic 3, the ’403 Patent, the FCC Document, and/or the Petition for Rulemaking Document had been disclosed to the Examiner, the Examiner would have had information that was highly material to certain arguments and limitations advocated as distinctions over the prior art of record (which did not include Petrovic 1, Petrovic 2, Petrovic 3, the ’403 Patent, the FCC Document, or the Petition for Rulemaking Document).

75. Upon information and belief, the Examiner would not have allowed independent claims 1, 3, and 5 to issue if he was aware of Petrovic 1, Petrovic 2, Petrovic 3, the ’403 Patent, the FCC Document, and/or the Petition for Rulemaking Document. Therefore, Petrovic 1, Petrovic 2, Petrovic 3, the ’403 Patent, the FCC Document, and/or the Petition for Rulemaking Document are but-for material prior art.

76. Upon information and belief, Mr. Roehr and Mr. Cameron knew, prior to the issuance of the ’891 Patent, that Petrovic 1, Petrovic 2, and Petrovic 3 disclosed a difference in the center frequencies of the outermost carriers from the band-edge of the mask of more than half the difference between the center frequencies of each adjacent carrier, as claimed in the ’718 Application.

77. Upon information and belief, Mr. Cameron, Mr. Roehr, and Mr. Hays knew, prior to the issuance of the ’891 Patent, that the ’403 Patent disclosed a difference in the center frequencies of the outermost carriers from the band-edge of the mask of more than half the

difference between the center frequencies of each adjacent carrier, as claimed in the ’718 Application.

78. Upon information and belief, Mr. Cameron knew, prior to the issuance of the ’891 Patent, that the FCC Document and the Petition for Rulemaking Document disclosed a difference in the center frequencies of the outermost carriers from the band-edge of the mask of more than half the difference between the center frequencies of each adjacent carrier, as claimed in the ’718 Application.

79. Upon information and belief, Mr. Roehr and Mr. Cameron knowingly, and with deceptive intent, failed to disclose Petrovic 1, Petrovic 2, and/or Petrovic 3 to the USPTO, because they knew that this highly material prior art might interfere with, or prevent, the issuance of a patent that contained the claims of the ’718 Application. Upon information and belief, this failure to disclose material prior art was the product of a deliberate act, one that was taken for the purposes to obtain a patent or claim scope to which they were not entitled, and for the purposes to obtain the competitive advantage an ill-gotten patent may provide.

80. Upon information and belief, Mr. Cameron, Mr. Roehr, and Mr. Hays knowingly, and with deceptive intent, failed to disclose the ’403 Patent to the USPTO, because they knew that this highly material prior art might interfere with, or prevent, the issuance of a patent that contained the claims of the ’718 Application. Upon information and belief, this failure to disclose material prior art was the product of a deliberate act, one that was taken for the purposes to obtain a patent or claim scope to which they were not entitled, and for the purposes to obtain the competitive advantage an ill-gotten patent may provide.

81. Upon information and belief, Mr. Cameron knowingly, and with deceptive intent, failed to disclose the FCC Document or the Petition for Rulemaking Document to the USPTO,

because he knew that this highly material prior art might interfere with, or prevent, the issuance of a patent that contained the claims of the ’718 Application. Upon information and belief, this failure to disclose material prior art was the product of a deliberate act, one that was taken for the purposes to obtain a patent or claim scope to which they were not entitled, and for the purposes to obtain the competitive advantage an ill-gotten patent may provide.

82. The ’891 Patent was obtained through inequitable conduct, and is therefore unenforceable because Mr. Cameron, Mr. Roehr, and Mr. Hays were involved in the prosecution of the ’718 Application and failed to disclose material prior art to the USPTO with the intent to deceive the USPTO to issue the ’891 Patent.

**Seventh Defense**
**(Inequitable Conduct for Failure to Join One or More Inventors as Co-Inventors of the ’891 Patent)**

83. The ’891 Patent was obtained through inequitable conduct for failure to join Dr. Rade Petrovic as a co-inventor and therefore is unenforceable, as set forth in detail below.

84. Upon information and belief, Dr. Petrovic substantially contributed to the technology described in Petrovic 1.

85. Upon information and belief, Dr. Petrovic substantially contributed to the technology described in Petrovic 2.

86. Upon information and belief, Dr. Petrovic substantially contributed to the technology described in Petrovic 3.

87. Upon information and belief, Dr. Petrovic collaborated with Mr. Roehr and Mr. Cameron to develop the multicarrier modulation techniques claimed in the ’718 Application from at least between the time of the development of the presentation of Petrovic 1 through the final revision of Petrovic 3.

88. Upon information and belief, Dr. Petrovic conceived of at least one limitation of one or more of the claims in the ’891 Patent and that conception was conveyed to one or more of the Applicants from at least the time between of the development of the presentation of Petrovic 1 through the final revision of Petrovic 3.

89. Notwithstanding his contribution to the conception of at least one claim of the ’891 Patent, Dr. Petrovic was not named as a co-inventor. Upon information and belief, Dr. Petrovic was not named as a co-inventor at the time of the filing of the ’718 Application due to a dispute over ownership of patents naming Dr. Petrovic as an inventor.

90. Upon information and belief, Dr. Petrovic was employed as a professor at the University of Mississippi from about 1989 to about 1997. Upon information and belief, in or around 1990 or 1991, Dr. Petrovic also was hired by MTel’s predecessor-in-interest to collaborate on the inventions that eventually matured into the ’891 Patent.

91. Upon information and belief, in or around 1995, a dispute arose between MTel’s predecessor-in-interest and the University of Mississippi when the University of Mississippi claimed rights to patents naming Dr. Petrovic as an inventor.

92. Upon information and belief, Dr. Petrovic was not named as a co-inventor on the application that issued as the ’891 Patent as a consequence of that dispute, despite the fact that Dr. Petrovic had contributed to the inventions claimed in the ’891 Patent.

93. Upon information and belief, Mr. Roehr and Mr. Cameron knew that Dr. Petrovic substantially contributed to at least one limitation of the claims of the ’718 Application.

94. On or about September 18, 1995, Mr. Cameron executed a Declaration and Power of Attorney in connection with the ’718 Application that included a signed declaration in which

he declared that he was the original, first and joint inventor of the subject matter claimed in the ’718 Application and for which a patent was sought.

95. On or about September 11, 1995, Mr. Roehr executed a Declaration and Power of Attorney in connection with the ’718 Application that included a signed declaration in which he declared that he was the original, first and joint inventor of the subject matter claimed in the ’718 Application and for which a patent was sought.

96. Upon information and belief, Mr. Roehr and Mr. Cameron knew that Dr. Petrovic’s contributions to one or more claims of the ’718 Application were material to the prosecution of the ’718 Application and knew of their individual duties to disclose such material information regarding Dr. Petrovic’s contribution to one or more claims of the ’718 Application to the USPTO.

97. Upon information and belief, a reasonable examiner would have considered the omission of Dr. Petrovic material to the patentability of the ’718 Application, because if Mr. Roehr and Mr. Cameron had informed the USPTO that Dr. Petrovic had contributed to the conception of one or more claims of the ’718 Application, the patent would not have issued pursuant to 35 U.S.C. § 116.

98. Upon information and belief, Mr. Roehr and Mr. Cameron knowingly, and with deceptive intent, failed to join Dr. Petrovic as a co-inventor on the ’718 Application.

## Eighth Defense
**(Inequitable Conduct for Making False Statements to the Patent Examiner Regarding Claim Scope with Intent to Deceive for the ’891 Patent)**

99. Each and every claim of the ’891 Patent is unenforceable because one or more of the named inventors and/or their patent counsel made false statements to the USPTO during prosecution of the ’891 Patent regarding the scope of issued claim 5.

100. The ’891 Patent was obtained through inequitable conduct for making false statements to the USPTO regarding the scope of issued claim 5 with intent to deceive and therefore is unenforceable, as set forth in detail below.

101. The ’718 Application was filed with a total of eight claims.

102. Claim 5 of the ’718 Application, as filed, recited the limitation “transmitting said plurality of carriers over a plurality of subchannels spaced asymmetrically within the mask defining said channel.”

103. Claim 8 of the ’718 Application, as filed, recited “The method according to claim 5 wherein the frequency difference between the center frequency of the outer most carriers and the band edge of said mask is greater than half the frequency difference between the center frequencies of each adjacent carrier.”

104. In an Office Action dated February 1, 1996, the Examiner of the ’718 Application rejected claim 5. In that same Office Action, the Examiner stated that “Claim 8 is objected to as being dependent upon a rejected base claim, but would be allowable if rewritten into independent form including all of the limitations of the base claim and any intervening claims.”

105. On or about August 9, 1996, the Applicants, through their attorneys, filed an Amendment during prosecution of the ’718 Application. The Amendment canceled claim 8 and added a new claim 9. Claim 9 recited the limitation “transmitting said plurality of carriers over a plurality of subchannels spaced within the mask defining said channel.” In the Remarks section of the Amendment, the Applicants, through their attorneys, stated “claim 8 has been canceled and rewritten in independent form as new claim 9, which includes the limitations of claim 5. Applicants submit that claim 9 is therefore also in condition for allowance.”

106. Claim 9 of the ’718 Application did not include all of the limitations of claim 5 of the ’718 Application. Claim 5 of the ’718 Application, as filed, included the limitation “a plurality of subchannels spaced asymmetrically within the mask.” Claim 9 of the ’718 Application included the limitation “a plurality of subchannels spaced within the mask.” Claim 9 of the ’718 Application did not include the word “asymmetrically” that was included in claim 5 of the ’718 Application, as filed. Claim 9 of the ’718 Application was not claim 8 of the ‘718 Application rewritten into independent form.

107. In the Office Action dated October 15, 1996, the Examiner of the ’718 Application stated that “Claims 1-4 and 9 are allowable over the prior art of record.”

108. Claim 9 of the ’718 Application issued as claim 5 of the ‘891 Patent.

109. Claim 9 of the ’718 Application is broader in scope than claim 8 of the ’718 Application.

110. In the Opening Claim Construction Brief filed on September 16, 2014 in *Mobile Telecommunications Technologies, LLC v. T-Mobile USA, Inc. et al.*, Case No. 2:13-cv-886-JRG-RSP (E.D. Texas) (Dkt. No. 58), MTel stated that “[t]he prosecution history of the ’891 Patent further demonstrates that the Patentee intentionally dropped the limitation that the subchannels must be spaced ‘asymmetrically’ within the mask.” MTel also stated in that document that the Applicants “purposefully excluded ‘asymmetrically’” from claim 5 of the ’891 Patent.

111. The Applicants of the ’891 Patent, and/or their attorneys, intentionally dropped the limitation that the subchannels must be spaced “asymmetrically” within the mask for the claim that issued as claim 5 of the ’891 Patent.

112. The Applicants of the ’891 Patent, and/or their attorneys, purposefully excluded the word “asymmetrically” from the claim that issued as claim 5 of the ’891 Patent.

113. The Applicants of the ’891 Patent, and/or their attorneys, intended to deceive the Examiner of the ’718 Application to allow a broader claim than the Examiner found allowable by rewriting claim 8 of the ’718 Application into claim 9 of the ’718 Application, but intentionally and purposefully removing the term “asymmetrically” from claim 9 of the ’718 Application when that term was a limitation on claim 8 of the ’718 Application.

114. Upon information and belief, this incorrect drafting of claim 5 of the ’891 Patent was the product of a deliberate act, one that was taken for the purposes to obtain a patent or claim scope to which they were not entitled, and for the purposes to obtain the competitive advantage an ill-gotten patent may provide. The misrepresentation by the Applicants, and/or their attorneys, concerning the scope of claim 9 of the ’718 Application was made with intent to deceive the USPTO into issuing a broader claim than that the USPTO previously determined allowable.

115. The ’891 Patent was obtained through inequitable conduct, and is therefore unenforceable, because Applicants, and/or their attorneys, misrepresented the scope of claim 9 of the ’718 Application with intent to deceive the USPTO.

## Ninth Defense
## (Inequitable Conduct for Failure to Disclose Known Prior Art While Procuring the ’403 Patent with Intent to Deceive)

116. Claim 1 of the ’403 Patent is unenforceable because one or more of the named inventors and/or their patent counsel failed to disclose prior art highly material to patentability of that patent with the intent to deceive the USPTO.

117. On or about November 12, 1992, Dennis W. Cameron, Walter C. Roehr, Rade Petrovic, Jai P. Bhagat, Masood Garahi, William D. Hays, and David W. Ackerman (the

"Applicants") filed a patent application with the United States Patent and Trademark Office ("USPTO") through their attorneys and which the USPTO assigned U.S. Patent Application No. 07/973,918 ("the '918 Application").

118. On or about December 31, 1996, the USPTO issued the '403 Patent as a result of the '918 Application.

119. On or about November 12, 1993, Applicant Mobile Telecommunication Technologies filed PCT application number PCT/US93/10713 with the International Bureau of the World Intellectual Property Organization (the "PCT Application"). The PCT Application claims priority to the '918 Application. The PCT Application included a claim 1 that was identical to claim 1 that issued in the '403 patent.

120. The PCT Application entered the regional phase in Europe as European Patent Application No. 94901305.6 (the "European Application"). The European Application included a claim 1 that was identical to claim 1 that issued in the '403 patent.

121. The International Search Report for the PCT Application was published on or about July 7, 1994, identifying prior art found by the examiner of the PCT application. The International Preliminary Examination Report for the PCT Application was issued on or about December 27, 1994, indicating that claim 1 of the PCT Application was not patentable in view of the prior art identified in the International Search Report. The European Patent Office Communication was issued on or about November 10, 1995, finding that claim 1 of the European Application was not patentable over the art that was identified in the International Search Report.

122. Claim 1 of the European Application, which was identical in all respects to claim 1 of the ’918 Application, was cancelled by the Applicants on or about May 3, 1996, more than 6 months before the ’403 Patent issued.

123. Upon information and belief, the Applicants, as named inventors on the PCT Application and the European Application, had knowledge of the International Search Report, the International Preliminary Examination Report, and the European Patent Office Communication before the ’918 Application issued as the ’403 Patent.

124. On or about January 8, 1993, Mr. Cameron executed a Declaration and Power of Attorney in connection with the ’918 Application that included a signed declaration in which he acknowledged the duty to disclose information that was material to patentability as defined in 37 C.F.R. § 1.56 at all times while the ’918 Application was pending. It further included a signed declaration in which Mr. Cameron acknowledged that he had reviewed and understood the contents of the ’918 Application’s specification, including the claims in the ’918 Application.

125. On or about January 8, 1993, Mr. Roehr executed a Declaration and Power of Attorney in connection with the ’918 Application that included a signed declaration in which he acknowledged the duty to disclose information that was material to patentability as defined in 37 C.F.R. § 1.56 at all times while the ’918 Application was pending. It further included a signed declaration in which Mr. Roehr acknowledged that he had reviewed and understood the contents of the ’918 Application’s specification, including the claims in the ’918 Application.

126. On or about January 11, 1993, Mr. Petrovic executed a Declaration and Power of Attorney in connection with the ’918 Application that included a signed declaration in which he acknowledged the duty to disclose information that was material to patentability as defined in 37 C.F.R. § 1.56 at all times while the ’918 Application was pending. It further included a signed

declaration in which Mr. Petrovic acknowledged that he had reviewed and understood the contents of the ’918 Application’s specification, including the claims in the ’918 Application.

127. On or about January 6, 1993, Mr. Bhagat executed a Declaration and Power of Attorney in connection with the ’918 Application that included a signed declaration in which he acknowledged the duty to disclose information that was material to patentability as defined in 37 C.F.R. § 1.56 at all times while the ’918 Application was pending. It further included a signed declaration in which Mr. Hays acknowledged that he had reviewed and understood the contents of the ’918 Application’s specification, including the claims in the ’918 Application.

128. On or about January 7, 1993, Mr. Garahi executed a Declaration and Power of Attorney in connection with the ’918 Application that included a signed declaration in which he acknowledged the duty to disclose information that was material to patentability as defined in 37 C.F.R. § 1.56 at all times while the ’918 Application was pending. It further included a signed declaration in which Mr. Garahi acknowledged that he had reviewed and understood the contents of the ’918 Application’s specification, including the claims in the ’918 Application.

129. On or about January 6, 1993, Mr. Hays executed a Declaration and Power of Attorney in connection with the ’918 Application that included a signed declaration in which he acknowledged the duty to disclose information that was material to patentability as defined in 37 C.F.R. § 1.56 at all times while the ’918 Application was pending. It further included a signed declaration in which Mr. Hays acknowledged that he had reviewed and understood the contents of the ’918 Application’s specification, including the claims in the ’918 Application.

130. On or about January 8, 1993, Mr. Ackerman executed a Declaration and Power of Attorney in connection with the ’918 Application that included a signed declaration in which he acknowledged the duty to disclose information that was material to patentability as defined in 37

C.F.R. § 1.56 at all times while the ’918 Application was pending. It further included a signed declaration in which Mr. Ackerman acknowledged that he had reviewed and understood the contents of the ’918 Application’s specification, including the claims in the ’918 Application.

131. Upon information and belief, the Applicants continued to be aware of the status and content of the claims pending in the ’918 Application during the prosecution of the ’918 Application.

132. Upon information and belief, given their participation as named co-inventors of the PCT Application and the European Application, the Applicants knew that the International Search Report, the International Preliminary Examination Report, and the European Patent Office Communication were material to the claims prosecuted in the ’918 Application and knew of their individual duties to disclose material prior art to the USPTO for consideration in evaluating the patentability of those claims.

133. Throughout the prosecution of the ’918 Application that matured into the ’403 Patent, the Applicants never disclosed any of the International Search Report, the International Preliminary Examination Report, or the European Patent Office Communication references to the USPTO.

134. The International Search Report, the International Preliminary Examination Report, and the European Patent Office Communication references were not considered by the USPTO during prosecution of the ’403 Patent.

135. The International Search Report, the International Preliminary Examination Report, and the European Patent Office Communication each addressed a claim that was identical to claim 1 of the ’403 Patent.

136. The teachings of International Search Report, the International Preliminary Examination Report, and the European Patent Office Communication are highly material to the patentability of claim 1 of the ’403 Patent.

137. Upon information and belief, a reasonable examiner in the USPTO would have considered the International Search Report, the International Preliminary Examination Report, and/or the European Patent Office Communication highly material to the patentability of the ’918 Application.

138. Upon information and belief, the Examiner would not have allowed independent claim 1 to issue if he was aware of the International Search Report, or the International Preliminary Examination Report and/or the European Patent Office Communication, which found that claim 1 of the PCT Application and claim 1 of the European Application were not patentable over the prior art cited in the International Search Report. Therefore, the International Search Report, the International Preliminary Examination Report, and/or the European Patent Office Communication are but-for material prior art.

139. Upon information and belief, the Applicants knowingly, and with deceptive intent, failed to disclose the International Search Report, the International Preliminary Examination Report, and the European Patent Office Communication to the USPTO because they knew that this highly material information might interfere with, or prevent, the issuance of a patent that contained claim 1 of the ’918 Application. Upon information and belief, this failure to disclose material information was the product of a deliberate act, one that was taken for the purposes to obtain a patent or claim scope to which the Applicants were not entitled, and for the purposes to obtain the competitive advantage an ill-gotten patent may provide.

140. The ’403 Patent was obtained through inequitable conduct, and is therefore unenforceable because the Applicants were involved in the prosecution of the ’918 Application and failed to disclose material information to the USPTO with the intent to deceive the USPTO to issue the ’403 Patent.

**Tenth Defense**
**(Inequitable Conduct for Failure to Join One or More Inventors as Co-Inventors of the ’210 Patent)**

141. The ’210 Patent was obtained through inequitable conduct for failure to join Dr. Rade Petrovic as a co-inventor and therefore is unenforceable, as set forth in detail below.

142. On July 24, 1997, Dennis Wayne Cameron, Walter Charles Roehr, Jai P. Bhagat, Masood Garahi, William D. Hays, and David W. Ackerman filed a patent application with the USPTO through their attorneys and which the USPTO assigned U.S. Patent Application No. 08/899,476 (“the ’476 Application”).

143. The ’476 Application was filed as a continuation of prior USPTO Application No. 08/760,457 (“the ’457 Application”) filed on December 6, 1996, and later abandoned. The ’457 Application listed Dennis Wayne Cameron, Walter Charles Roehr, Jai P. Bhagat, Masood Garahi, William D. Hays, David W. Ackerman, and Rade Petrovic as inventors.

144. By Preliminary Amendment and Petition to Correct Inventorship dated December 6, 1996, Rade Petrovic was removed as a named co-inventor on the ’457 Application.

145. On June 22, 1999, the USPTO issued the ’210 Patent as a result of the ’476 Application.

146. The ’210 Patent lists only Dennis Wayne Cameron, Walter Charles Roehr, Jai P. Bhagat, Masood Garahi, William D. Hays, and David W. Ackerman as inventors.

147. Upon information and belief, Dr. Petrovic collaborated with Dennis Wayne Cameron, Walter Charles Roehr, Jai P. Bhagat, Masood Garahi, William D. Hays, and David W. Ackerman to develop the systems and techniques claimed in the ’476 Application

148. Notwithstanding his contribution to the conception of at least one claim of the ’210 Patent, Dr. Petrovic was not named as a co-inventor. Upon information and belief, Dr. Petrovic was removed as a co-inventor on the ’210 Patent due to disputes between MTel and the University of Mississippi that were ongoing at the time of the filing of the ’476 Application and its parent ’457 Application.

149. Upon information and belief, MTel and the University of Mississippi had entered into a partnership with the University of Mississippi to collaborate on the inventions that eventually matured into the ’210 Patent.

150. Upon information and belief, a dispute arose between MTel and the University of Mississippi when the University of Mississippi claimed rights to the ’210 Patent based on Dr. Petrovic’s employment with the University of Mississippi.

151. Upon information and belief, Dr. Petrovic was removed as a co-inventor on the ’210 Patent as a consequence of that dispute and despite the fact that he had contributed to the inventions claimed in the ’210 Patent.

152. Upon information and belief, Dennis Wayne Cameron, Walter Charles Roehr, Jai P. Bhagat, Masood Garahi, William D. Hays, and David W. Ackerman knew that Dr. Petrovic substantially contributed to at least one limitation of the claims of the ’476 Application.

153. On or about January 8, 1993, Mr. Cameron executed a Declaration and Power of Attorney in connection with the ’476 Application that included a signed declaration in which he

declared that he was the original, first and joint inventor of the subject matter claimed in the ’476 Application and for which a patent was sought.

154. On or about January 8, 1993, Mr. Roehr executed a Declaration and Power of Attorney in connection with the ’476 Application that included a signed declaration in which he declared that he was the original, first and joint inventor of the subject matter claimed in the ’476 Application and for which a patent was sought.

155. On or about January 6, 1993, Mr. Bhagat executed a Declaration and Power of Attorney in connection with the ’476 Application that included a signed declaration in which he declared that he was the original, first and joint inventor of the subject matter claimed in the ’476 Application and for which a patent was sought.

156. On or about January 7, 1993, Mr. Garahi executed a Declaration and Power of Attorney in connection with the ’476 Application that included a signed declaration in which he declared that he was the original, first and joint inventor of the subject matter claimed in the ’476 Application and for which a patent was sought.

157. On or about January 6, 1993, Mr. Hays executed a Declaration and Power of Attorney in connection with the ’476 Application that included a signed declaration in which he declared that he was the original, first and joint inventor of the subject matter claimed in the ’476 Application and for which a patent was sought.

158. On or about January 8, 1993, Mr. Ackerman executed a Declaration and Power of Attorney in connection with the ’476 Application that included a signed declaration in which he declared that he was the original, first and joint inventor of the subject matter claimed in the ’476 Application and for which a patent was sought.

159. Upon information and belief, Dennis Wayne Cameron, Walter Charles Roehr, Jai P. Bhagat, Masood Garahi, William D. Hays, and David W. Ackerman knew that Dr. Petrovic's contributions to one or more claims of the '476 Application were material to the prosecution of the '476 Application and knew of their individual duties to disclose such material information regarding Dr. Petrovic's contribution to one or more claims of the '476 Application to the USPTO.

160. Upon information and belief, a reasonable examiner would have considered the omission of Dr. Petrovic material to the patentability of the '476 Application, because if Mr. Dennis Wayne Cameron, Walter Charles Roehr, Jai P. Bhagat, Masood Garahi, William D. Hays, and David W. Ackerman had informed the USPTO that Dr. Petrovic had contributed to the conception of one or more claims of the '476 Application, the patent would not have issued pursuant to 35 U.S.C. § 116.

161. Upon information and belief, Dennis Wayne Cameron, Walter Charles Roehr, Jai P. Bhagat, Masood Garahi, William D. Hays, and David W. Ackerman knowingly, and with deceptive intent, removed Dr. Petrovic as a co-inventor on the '476 Application in light of the dispute with the University of Mississippi.

## Eleventh Defense
## (Inventorship)

162. One or more claims of the one or more of the Patents-in-Suit are invalid for improper inventorship under 35 U.S.C. § 102(f) and 35 U.S.C. § 116.

## Reservation of Rights to Assert Additional Defenses

163. TWC is presently investigating the facts relating to the issuance of the Patents-in-Suit, the assignment of the Patents-in-Suit to MTel, and the assertions of infringement against

TWC, and will continue to do so throughout the discovery process. To the extent that this investigation reveals any improprieties in connection with such matters, TWC reserves the right to seek leave to amend to assert such allegations and/or defenses based thereon that may be appropriate.

In addition to the defenses described above, TWC reserves all defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the patent laws of the United States and any other defenses, at law or in equity, which may now exist or in the future become available based on discovery and further factual investigation in this case.

Dated: March 18, 2016

Respectfully submitted,

*/s/ Alison H. Hutton*

L. Norwood Jameson
wjameson@duanemorris.com
Matthew C. Gaudet
mcgaudet@duanemorris.com
Matthew S. Yungwirth
msyungwirth@duanemorris.com
Alison H. Hutton
ahhutton@duanemorris.com
**DUANE MORRIS LLP**
1075 Peachtree Street, Suite 2000
Atlanta, GA 30309
Telephone: 404.253.6932
Facsimile: 404.393.4249

Joseph A. Powers
japowers@duanemorris.com
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: 215.979.1842
Facsimile: 215.689.3797

Michael E. Jones
mikejones@potterminton.com
**POTTER MINTON**
110 N College Avenue
Suite 500

Tyler, TX 75702
Telephone: 903-597-8311
Facsimile: 903-593-0846

**ATTORNEYS FOR DEFENDANTS TIME WARNER CABLE INC., TIME WARNER CABLE ENTERPRISES LLC, and TIME WARNER CABLE TEXAS LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a) on March 18, 2016.

*/s/ Alison H. Hutton*
Alison H. Hutton